LINTON and Wife *v.* BROWN'S ADM'RS and others.

*(Circuit Court, W. D. Pennsylvania.* May 23, 1884.)

DECLARATION OF TRUST—ACTUAL MANUAL DELIVERY NOT ESSENTIAL TO ITS VALIDITY.

In cases of declarations of trust and deeds of conveyance or mortgage, when nothing further is expected to be done by the beneficiary or grantee to complete the transaction as a whole, a formal sealing and delivery, without an actual delivery to the other party, or to a third person for his use, will be sufficient to make the deed or declaration operative immediately, unless something else exist or be done to qualify such formal delivery.

In Equity.

*Till Burgwin, George W. Guthrie,* and *James P. Colter,* for complainants.

*George Shiras, Jr.,* and *Joseph Buffington,* for respondents.

Before BRADLEY and ACHESON, JJ.

BRADLEY, Justice. The bill in this case was filed by Augustus F. Linton and Phebe R. E. Elwina, his wife, against the administrators, with the will annexed, of James E. Brown, deceased, and against his widow, Kate L. Brown, and infant son, James E. Brown, Jr., (by his guardian, Charles T. Neale,) the Kittanning National Bank, and the

First 'National Bank of Kittanning, to establish certain trusts, alleged to have been established and declared by James E. Brown, in his lifetime, and by John B. Finlay, and for an account of the said trusts. Copies of the instruments by which the said trusts are alleged to have been created are annexed to the bill as exhibits, marked, respectively, A, C, and D. Exhibit C is an assignment, dated August 10, 1865, by which Mr. Brown, in consideration of the love and affection which he bore to his daughter, Jane B. Finlay, and to her daughter, Phebe R. E. Elwina Finlay, (who is now the wife of Augustus F. Linton, and one of the complainants,) assigned to said Jane 610 shares of the capital stock of the First National Bank of Kittanning, amounting to $61,000, but to remain in his (said Brown's) name and under his control during his life, as trustee for the said Jane, for her sole and separate use, free from the control of her husband, during her natural life, and after her death the stock, with its accretions and accumulations, in trust for the sole and separate use of the said Phebe R. E. Elwina, free from the control of her husband, and in the event of the death of both of said beneficiaries in his life-time, the said stock, and its unused and funded or invested accumulations, to revert and return to himself, the said Brown. The terms of the trust are somewhat amplified in the instrument, but the general scope of it is as now stated. This instrument is admitted to be valid and binding, and the trusts contained in it are acknowledged by the defendants to be operative. Exhibit D is also admitted to be a valid and subsisting trust, and its execution is not opposed by the defendants. It is a release from John B. Finlay of all his right, title, and interest in his deceased wife's estate, to James E. Brown, in trust for the sole use of his daughter, Phebe R. E. Elwina Finlay, (now Linton,) one of the complainants, her heirs and assigns, until she should reach her majority, and then to be unconditionally transferred to her, her heirs and assigns. The other document, Exhibit A, is denied to be a valid and subsisting instrument, and its validity forms the principal subject of controversy at this stage of the case. It purports to be a deed-poll of the said James E. Brown, bearing date the twenty-third day of July, A. D. 1867, by which the said Brown, in consideration of $500 to him paid by his daughter, Jane B. Finlay, and of the natural affection he had for her and her child, Phebe R. E. Elwina Finlay, granted, bargained, sold, conveyed, and transferred to the said Jane during her natural lifetime, and to her said daughter after her death, all the real estate situated in the states of Pennsylvania, Wisconsin, Illinois, Missouri, and Nebraska, which Dr. John B. Finlay (husband of said Jane) had theretofore conveyed to him, the said Brown; all the personal estate, choses in actions, and claims which had been assigned and transferred to him, the said Brown, by the said John B. Finlay, and were yet held by said Brown; also all the claims, debts of every character which he held, and which were justly due to him by John B. Finlay and by Jane B. Finlay; and also the whole indebtedness to him by the firm of

Finlay & Co., including the transfer to him, said Brown, of said firm, in writing, dated November 7, 1866,—to be held and possessed by his said daughter and granddaughter, and their heirs and assigns, upon certain terms and conditions, which were then specified in the deeds, which were in substance nearly identical with the trusts declared in the previous instrument, Exhibit C; namely, that the property conveyed should remain in his, said Brown's, name, and under his control as trustee for them, during his natural life, for the sole and separate use of his said daughter during her natural life, and after her death for the exclusive use, benefit, and behoof of her said child and his granddaughter, Phebe R. E. Elwina, and her heirs and assigns, free from the liabilities, debts, and control of the husband of either his said daughter or granddaughter; and the proceeds of any of the property that might be disposed of with the consent of the grantee then living to be subject to the same terms and conditions; and if both of said grantees should die, in his, the said Brown's, life-time, the property unused should revert to him.

The validity of this deed, as before stated, is disputed by the defendants. They contend that it was never out of James E. Brown's possession during his life-time, was never delivered by him, and never became an effectual deed; and whether it was executed and delivered by him, and became an effectual deed, is the principal question now to be determined. As by the terms of the deed itself Mr. Brown was to be the trustee during his life-time, the fact of retaining it in his possession is of little consequence. If he was not the only proper custodian of it, there was, at least, no impropriety or repugnancy to its validity in his keeping it. Whether it was sufficiently executed and delivered by him, so as to become a valid and effectual instrument, is another question, which we shall proceed to examine.

As the surrounding circumstances under which a deed is executed often have an important bearing upon the question of its definitive execution and delivery, it will be proper to state the leading circumstances which existed in this case. When the deed was executed (or purported to be) James E. Brown resided in Kittanning, Armstrong county, Pennsylvania, being considerably advanced in life, and possessed of a very large estate. He had no family but a wife by a second marriage, the said Kate L. Brown, one of the defendants in this case. He had an only child by a former marriage, the said Jane B. Finlay, wife of John B. Finlay, who also resided in Kittanning, adjoining the building in which the First National Bank of Kittanning was located, (of which Mr. Brown was the principal, if not sole, stockholder,) and in which he also had his private office. Mrs Finlay had an only child, the said Phebe R. E. Elwina Finlay, who was then (in 1867) about five years of age. This child, therefore, was at that time the only apparent descendant of Mr. Brown in the third generation. The probabilities, therefore, are in favor of such a provision for Mrs. Finlay and her child as was made by Mr. Brown by

the deed in question. At least, it may be said that such a provision was not an unreasonable or an improbable one for him to make.

In the next place, the property embraced in the deed consisted of lands in Pennsylvania, and several western states, which John B. Finlay had recently (mostly in November previous) conveyed to Mr. Brown, and personal estate, judgments, and claims which had been assigned by John B. Finlay to Brown; and also all claims held by Brown against Finlay, Mrs. Finlay, and Finlay & Co., (in which Mrs. Finlay was a partner,) including the property of Finlay & Co. transferred to Mr. Brown by an instrument dated November 7, 1866. The subject of the trust, therefore, consisted mostly of property which had belonged to John B. Finlay, or to Jane B. Finlay, his wife, or in which they were interested, and of debts due from them to Mr. Brown, and was not taken from the general mass of Mr. Brown's own estate, unconnected with the interest of the Finlays. It may be added that the firm of Finlay & Co. consisted of Mrs. Jane B. Finlay and one Joseph Alcorn, and that their business consisted in carrying on a woolen factory in Kittanning, situated on a lot of ground which Mr. Brown, in January, 1866, had conveyed to his son-in-law, John B. Finlay, in trust for his daughter, Jane B. Finlay; also that on the second of February, 1867, John B. Finlay conveyed to Mr. Brown a tract of land in Kittanning township, in the county of Armstrong, consisting of 319 acres, which the latter, on the same day, conveyed to his daughter, upon the same trusts, for her sole and separate use during her life, and after her death for the sole and separate use of his granddaughter, as are contained and declared in the deed in question; Mr. Brown reserving the control thereof during his life-time as their trustee, and the reversion of the property in case they should both die in his life-time, precisely as in the said deed, Exhibit A.

The deed in question, therefore, if valid, is but one of a series of acts of the same general character by which James E. Brown had transferred property to or for the use of his daughter and granddaughter. Such being the condition of Mr. Brown's family, such his relations to the beneficiaries named in the deed in question, and such the character and derivation of the property conveyed thereby, we proceed to consider the circumstances of its execution. The undisputed facts are as follows:

Mr. Brown drew the deed himself; it is all in his own handwriting, even to the attestation clause, so that it required nothing but the signatures of himself and the witnesses to be a perfect deed in form. Sometime on the day of its date, the twenty-third of July, 1867, he called into his private office, in the rear of the bank, the cashier, William Pollock, and another man, by the name of Absalom Reynolds, to witness its execution, and in their presence signed his name opposite a scroll seal, and then the witnesses signed their names to the attestation clause, which reads as follows: "Signed, sealed, and delivered in presence of ABSALOM REYNOLDS, W. POLLOCK." Then followed a receipt for the purchase money, also in Mr. Brown's writing, as follows: "Received of Mrs. Jane B. Finlay five hundred dollars, being the consideration money above mentioned," which he also signed, and which Mr. Pollock

witnessed as follows: "Attest—W. POLLOCK." In the margin, by the side of this receipt, is affixed a government internal revenue stamp of 50 cents, cancelled by Mr. Brown himself, by the following memorandum written on its face: "23 July, '67. J. E. B." Whether this stamp was affixed before or after the execution does not appear. Then follows a certificate of acknowledgment, also in Mr. Brown's handwriting, as follows: "*Armstrong County, ss.:* Before me, Joseph Alcorn, a notary public in and for said county, came James E. Brown, above named, and acknowledged the foregoing deed to be his act and deed, and as such desired it to be recorded. Witness my hand and notarial seal the twenty-third July, 1867." On the same day Mr. Brown acknowledged the execution of the deed before Joseph Alcorn, a notary public, who thereupon affixed his official seal to the certificate, and signed it in his official character, thus: "JOSEPH ALCORN, Notary Public."

The fact of the execution is testified to by William Pollock, the other subscribing witness being dead; but all that Mr. Pollock can recollect of the circumstances is that he was called in from the bank to witness the paper; that Mr. Brown signed it in the presence of himself and Reynolds; and that they signed it as subscribing witnesses, when he, Pollock, went back into the bank. The fact of the acknowledgment is shown by the certificate of acknowledgment, which proves itself, and is also testified to by Alcorn, the notary public. The document thus executed, attested, and acknowledged, and the acknowledgment thus certified, was found at Mr. Brown's death in a sealed envelope, with his will, executed March 30, 1871, in the custody of William Pollock, who was a witness to the will as well as the deed, and to whom Mr. Brown had intrusted it for safe keeping several years previously. After Mr. Brown's decease, Pollock produced the envelope to his family, when it was opened, the will read, and the deed delivered to John B. Finlay, (his wife being then deceased,) and both papers were handed back to Pollock, with the request to have the will registered and the deed recorded, which was done.

The facts as now stated are undisputed, and we might stop here and ask whether the deed in question is not, by this evidence alone, well and sufficiently proved to have been duly executed and delivered, so as to become a valid and operative instrument on the day of its date? Or, if not operative as a deed of conveyance to transfer the legal title, whether it was not at least operative as a declaration of trust, binding upon James E. Brown and his heirs at law? We are inclined to think it was both. If valid as a deed of conveyance, of course it was valid as a declaration of the trusts contained in it, although it might possibly be valid as a declaration of trust, without being valid as a conveyance of title.

But there is additional evidence as to the execution and delivery of the deed, which, though questioned by the defendants, is not materially contradicted, nor is the credibility of the witnesses impeached. John B. Finlay testifies that he was present when the deed in question was written by Mr. Brown; that it was written after consultation with him; that he was present when it was executed; that it was acknowledged the same day, before it was delivered; that after it was executed Mr. Brown went into the dining-room of witness, when the family were at dinner, and in presence of witness and one Robert H. Sayre delivered the paper to Mrs. Finlay, witness' wife; that she handed it to witness to take care of; and that he placed it

in the pigeon-hole, in the vault of the bank, marked "Finlay papers," where he kept his papers, and that he next saw the paper the day the will of Mr. Brown was read, when it was taken out of the envelope as testified to by Pollock.    He further testifies that a certain memorandum on the paper just after the acknowledgment, which is in Mr. Brown's handwriting, was not on the paper when it was delivered.    This witness also testifies to the payment of the $500, consideration money of the deed, on the same day on which the deed was executed; that it was paid by Mrs. Finlay, by assigning to Mr. Brown a contract for the purchase of some property in Kittanning, on which she had paid $710.    This contract was produced, and showed receipts for money paid on it to the amount of $710 prior to the execution of the deed; $210 being paid by the original party to the contract, who had assigned it to Mrs. Finlay, and $500 paid by Mrs. Finlay herself in January, 1867.    There is also indorsed upon it an assignment of the contract in Mr. Brown's handwriting, dated July 23, 1867, from Jane B. Finlay to James E. Brown.    Simon Truby, the other party to the contract, testifies that Mr. Brown paid him the balance due on it over and above the $710, and that he, thereupon, gave Mr. Brown a deed for the property.    The deed was produced in evidence, bearing date the twenty-second of July, 1867, but acknowledged on the twenty-third of July, the day on which the deed in question was executed.    These documents corroborate Mr. Finlay's testimony as to the payment and mode of payment of the consideration of the deed in question, as showing that Mrs. Finlay did, on the day of its execution, assign to her father the contract referred to; and that she had made the payments upon it which Mr. Finlay testifies she had done.

Mr. Finlay's testimony is further corroborated by the testimony of Sallie R. Brown, a niece of James E. Brown, who says that some time in the month of July, 1867, she went to the house of Mr. and Mrs. Finlay, in Kittanning, between 12 and 1 o'clock, at noon, and met her uncle, James E. Brown, coming out of the breakfast room, and spoke to him, and on going in she found them at dinner,—Col. Finlay, Mrs. Finlay, and Mr. Sayre; that Mrs. Finlay first asked her to take dinner, which she declined, and that then Mrs. Finlay, holding up a paper, said, "Come and let us have a jollification,—father has given me a deed for the western lands, the mill property, and factory;" that she did not examine the paper, but was near enough to recognize her uncle's handwriting on the back.    The deed in question being shown to her, she said it looked like the paper she saw. She fixes the date of the occurrence by the fact that her uncle was going to Butternuts, and did go the next morning.    It is shown by other evidence of a conclusive character that Mr. Brown and his wife left Kittanning on the morning of the twenty-fourth of July for Butternuts, New York, on a visit to Mrs. Brown's parents, and were absent until near the middle of August; so that the time of the occur-

fence testified to by the witness must have been the twenty-third day of July, the day on which the deed was executed and dated. An occurrence of this kind, happening in such immediate connection with the transaction, and while the emotion of gratification caused by it still displayed itself in the countenance and actions of the principal beneficiary, may be regarded as a spontaneous burst of the same feeling, and as part of the *res gestæ.*

There is nothing to contradict this very conclusive testimony, unless it be that of Joseph Alcorn, the notary public, who took the acknowledgment of the deed. He says that the acknowledgment was taken by him at Mr. Brown's house, in Kittanning, four or five squares from the bank, between sundown and dark, by lamp-light; that he stopped at the house with his seal, at Mr. Brown's request, and found him at a table with the paper in his hand; that Mr. Brown remarked that a portion of it was not as he expected, but that he would explain; that he then wrote the postscript which is below the acknowledgment. The postscript to which the witness referred, and which he pointed out on the deed, is a memorandum in Mr. Brown's handwriting, in the following words: "No indebtedness to the Kittanning Insurance Company, to the Kittanning National Bank, or the First National Bank of Kittanning, are to be affected by the above transfer; none of which is transferred, but remains unpaid and due thereto. J. E. B. 23 July, '67." The witness went on to state that at the time Mr. Brown wrote the postscript he said he was sorry he had not room to write it above the acknowledgment, but that he wanted him to recollect it; but that it made little difference, as he did not intend to deliver that deed; that Mr. Brown told him his object was that if he died without making a will he wanted his property to go as provided in it; otherwise, if he made his will, he wanted it to control."

It is to be observed of this evidence that it does not in the least contradict the testimony of William Pollock, John B. Finlay, and Sallie R. Brown, except the statement of Mr. Finlay that the deed was acknowledged before it was delivered to his wife. But if Mr. Finlay was mistaken in this circumstance it would not detract from the legal effect of the execution of the deed and its delivery to Mrs. Finlay. When thus delivered, it became a perfect deed, valid and operative as such, and passed out of the power of Mr. Brown to alter it or take it back by any subsequent declarations or *memoranda.* It is unnecessary, therefore, to scrutinize the remarkable statement made by Alcorn. In the first place, as an officer authorized to take the acknowledgment of a deed, he cannot be received to testify to anything repugnant to the legal effect of his certificate of acknowledgment. In the next place, it is quite possible that Alcorn may be mistaken as to the identity of the instrument on the acknowledgment of which the circumstance and conversation referred to by him took place. He was constantly in the habit of taking Mr. Brown's

acknowledgments to deeds and other instruments. The deed of February 2, 1867, already referred to, was acknowledged before him, and that had quite a long memorandum or postscript in the attestation clause, noting various alterations in the body of the instrument, and other cases of a similar nature might easily have occurred. Mr. Alcorn's testimony was taken 16 years after the deed was executed, and it would not be at all surprising that he should be mistaken in his recollection of a conversation which took place at such a distance of time. Besides, it is very clearly shown that he entertained inimical feelings against Finlay. He was the partner of Mrs. Finlay in the woolen factory, and, after the firm had assigned it to Mr. Brown, he remained in the superintendence for several months, and finally, when Mr. Brown determined that the concern should be closed up, he demanded a considerable sum of money in settlement; and when it was refused he threatened that he would have Finlay indicted for making false returns to the internal revenue department, and actually carried out his threats so far as to make complaint against Finlay, and to have proceedings instituted against him in the district court of the United States, which were subsequently quashed or dismissed by the court. We are satisfied that his testimony, if it would alter the case, is not of such a character as to invalidate that of the other witnesses referred to.

Both parties have referred, with considerable confidence, to the conduct of the parties after the execution of the deed with reference to the property embraced therein. But in our view there is nothing in their subsequent dealings with the property, or in their conduct or declarations, that can affect the validity and binding force of the instrument. Mr. Brown assumed the paramount control of the property; but this it was his right and duty to do as trustee for his daughter and granddaughter. It was natural, however, that as most of it, except the woolen-mill, had belonged to Mr. Finlay, who was presumably better acquainted with its condition and needs than any one else, the care of it should be deputed to him. And this was in fact the case. Mr. Finlay testifies that the rents of the real estate mentioned in the deed were received by him for Mrs. Finlay, or by herself, from the date of the deed until he went to Europe, in 1873, when he was absent about five months, and returned thither again in November, 1874; that the taxes were mostly paid by the tenants, except on the western property, "on which," he says, "they were paid by ourselves;" that he generally paid them. Tenant houses were built or repaired on some of the lands, and paid for by Mrs. Finlay, several of which he specifies. In April, 1878, when Mr. Finlay was about to go to Europe again, Mr. Brown, as Finlay testifies, requested him to make out a list of all the real estate, so that the taxes could be looked after, and he made such a list, which is produced in evidence. In 1879 Mr. Brown wrote to the witness, requesting him to come home and assist in attending to the property, but he did not return until June, 1880.

During the summer and fall of that year Finlay made an extended visit to the west to look after the western lands, and transacted a good deal of outside business besides for Mr. Brown, who was getting very old, and who died in the latter part of November.

At various times after the execution of the deed, when Mr. Brown had occasion to deal with or to speak of the property comprised in it, he spoke of it as held by him for his daughter or granddaughter, the former having died on the thirtieth of December, 1876. The only matters of a positive character in the evidence showing any conduct or declarations of Mr. Brown, after the deed was executed, inconsistent with the position held by him under its provisions, are what we shall now specify. It is shown that he used a considerable amount of Mrs. Finlay's money derived from the bank-stock which he had given her, or from other sources, to pay debts of the firm of Finlay & Co., or of Mr. or Mrs. Finlay, which, in and by the deed, had been given to her or for her use. He may have thought he might justly do this. He may have been mistaken, and his estate may be liable to account for such application of her money. We do not think that the fact of his doing what he did in this regard should have the effect to draw in question the validity of the instrument which he so solemnly executed and delivered.

Another transaction is strongly relied on by the defendants to show that Mr. Brown did not regard the deed in question as binding on him, and that his views of the subject were acquiesced in by John B. Finlay and his wife. On the first day of April, 1871, James E. Brown and his wife, Kate L. Brown, executed a deed of conveyance to Jane B. Finlay, her heirs and assigns, for nearly the same real estate which was conveyed by the deed of July 23, 1867, being described as "all that certain real estate situated in the states of Pennsylvania, Wisconsin, and Missouri, Nebraska, and Minnesota, which was conveyed to the said James by and more particularly described in the following conveyances, viz.,"—then describing the several deeds given by John B. Finlay to James E. Brown, in November, 1866. The purpose of the conveyance is then stated to be "for the sole and separate use of the said party of the second part, (Jane B. Finlay,) and her heirs and assigns, and to be uncontrolled, nor incumbered, nor charged by, nor liable, nor subject in any way to debts, contracts, or engagements of her present or future husband, nor of the future husband of her daughter, Phebe R. E. Elwina Finlay;" to have and to hold the said real estate and appurtenances for the purposes and limitations aforesaid, unto the said party of the second part, and her heirs and assigns, forever.

Mr. Brown did not constitute himself a trustee by this instrument. The deed appears to be regularly executed by the grantors, and witnessed by J. B. Heiner and W. Pollock, and acknowledged on the day of its date before said Heiner as a justice of the peace, and is stamped with government stamps to the amount of $10, the con-

sideration named in it being $10,000. It also has a receipt signed by J. E. Brown, written under the attestation, acknowledging that he received on the date, from Mrs. Jane B. Finlay, the sum of $10,000 in full of the consideration. There is no evidence in the case, however, except this receipt, that any money or valuable consideration was actually paid. It is shown that John B. Finlay left it for record in the recorder's office of Armstrong county on the ninth of October, 1871, and that it was taken by him again after being recorded; and it was subsequently, in the month of November, recorded in two counties in Nebraska. A certified copy of a lease was also given in evidence, dated July 23, 1879, and executed by one Hamlin as attorney in fact for the heirs of Jane B. Finlay, for a lot in Nebraska, in which the said deed was referred to. At this time, however, Mrs. Linton, the only heir at law of Mrs. Finlay, was only 17 years of age, and was a married woman.

John B. Finlay, being examined with regard to this deed, (of April 1, 1871,) says that he got it after this suit was commenced from W. D. Patton, a lawyer in Kittanning, and that he knew nothing about it from the time of his wife's death until it was handed to him or shown to him by Mr. Patton; and, when it was handed to him, there was a paper folded up in it in the handwriting of his wife. This paper was offered in evidence by the plaintiff, but was objected to as incompetent. It seems to consist of *memoranda* of instructions to counsel, and cannot have any legitimate effect as evidence, unless it be to show that Mrs. Finlay herself repudiated the deed. Perhaps, as the conduct of the parties is so searchingly inquired into for the purpose of ascertaining their intentions and understanding as to the validity and subsistence of the deed in question, this declaration of Mrs. Finlay, now deceased, is as good for the purpose as the declarations and conduct of Mr. Brown. In the memorandum, which is written and signed by her, she says—

"That this is not the original transfer; that J. E. Brown transferred to me said lands and said judgment, two years previous to this one, by paper signed, sealed, stamped, by himself and wife, and given into my possession; that said paper was handed to J. E. Brown, as custodian, and two years afterwards present paper was returned to me. Defendant now asks for production of first-named transfer.

[Signed]                                      "JANE B. FINLAY."

There is a further memorandum on the paper which does not appertain to this subject. On the back is indorsed a pencil memorandum in the handwriting of Mr. Painter,—a lawyer,—which probably furnishes some clue to the purpose of the memorandum. It is the title of a judgment, "*Kittaning Bank* v. *J. B. Finl*iy," and a note as to its date, (June term, 1867,) and that no *fi. fa.* had been issued on it; so, probably, one of the debts or judgments which Mrs. Finlay claimed to have been transferred to her, and on which proceedings against her were about to be taken. On the hearing we were dis-

posed to think that this paper was entirely incompetent, but we think it may be used as some evidence of Mrs. Finlay's position with regard to the deeds of 1867 and 1871. There are inaccuracies of date, and of some particulars, as that Mrs. Brown executed the first deed; but no more than might be expected when Mrs. Finlay was depending on mere recollection.

But this whole matter of subsequent conduct and declarations, including the deed of 1871, may be disposed of by the observation that, if the deed of July 23, 1867, was duly executed and delivered, as we have shown that it was, it could not be gotten rid of or taken back by Mr. Brown by any indirect methods of the kind referred to; certainly not as against his granddaughter, the present complainant, who did not come of age until February, 1883, after this suit was brought, and who has been a married woman since December, 1878. She would not be concluded by any waiver of rights which her mother, Mrs. Finlay, might have submitted to, if she did submit to any.

Under the view of the case which we have taken on its facts, it is hardly necessary to refer to any authorities on the question as to what will amount to an effectual execution and delivery of a deed and a declaration of trust. We will only indicate briefly a few of those which may be regarded as more directly bearing upon the subject in hand.

The case of *Doe* v. *Knight*, 5 Barn. & C. 671, settled the principle, if it was not settled before by the cases there referred to, that where an instrument is *formally* sealed and delivered, and there is nothing to qualify the delivery but the keeping the deeds in the hands of the executing party,—nothing to show he did not intend it to operate immediately,—that it is a valid and effectual deed, and that delivery to the party who is to take by it, or to any person for his use, is not essential. Of course, in the ordinary case between vendor and purchaser, it is not expected, on the one side or the other, that a deed of conveyance, though duly prepared and executed, and even acknowledged by the vendor, who retains it in his possession, is to have any effect or operation until the whole transaction is completed by the payment or security of the purchase money, and the actual delivery of the deed to the purchaser. In such a case there *is* something to show that the deed is not intended to operate immediately on its execution, and that something is the very nature of the transaction itself, and the universal understanding in relation to it. And hence it does not contravene the rule laid down in *Doe* v. *Knight*, but is strictly within its provision. But in the cases of declarations of trust, and deeds of conveyance or mortgage, where nothing further is expected to be done by the beneficiary or grantee to complete the transaction as a whole, the rule applies that a formal sealing and delivery, without an actual delivery to the other party, or to a third person for his use, will be sufficient to make the deed or declaration operate immediately, unless something else exist or be done to qualify such formal delivery.

v.20,no.8—30

In the present case the proof that the deed was formally signed, sealed, and delivered is complete. The signature and seal of the grantor, and the signatures of the witnesses to the attestation, are verified by one of the witnesses, and his non-recollection of the details of the transaction cannot impair the effect of the solemn attestation which he signed. He remembers nothing to derogate from its force. And the payment and receipt of the purchase money show that nothing further was required to be done by the grantee, or the parties for whose benefit the instrument was made. The other circumstances attending the transaction, to-wit, the fixing and cancellation of the government stamp, and the acknowledgment duly made and certified, corroborate the conclusion, and render it certain. So that, under the rule stated in *Doe* v. *Knight*, it did not need any actual delivery to Mrs. Finlay to render the deed a valid and operative instrument.

The principle of *Doe* v. *Knight* was fully adopted by the supreme court of Pennsylvania in *Blight* v. *Schenck*, 10 Barr, 285, in an elaborate judgment prepared by Judge ROGERS. The substance of the case is stated in the head-note, that where a grantor executes and acknowledges a deed before a magistrate, which had been left there for that purpose by the agent of the grantor and grantee, and leaves the instrument with the magistrate without instructions, the delivery is absolute; and instructions given to the agent on the next day not to deliver the deed until payment of the purchase money are immaterial, and do not amount to an escrow; for matters subsequent to an unqualified delivery to a stranger cannot make a delivery in escrow. The court say: "That the delivery was complete when the grantors declared before the proper officer that they signed, sealed, and delivered the deed, without saying or doing anything to qualify the delivery, is well settled on authority. If the grantee had been present at the time, either personally or by agent, no person would doubt that the title vested; but it is ruled that this will not prevent it taking effect as a good deed;" and reference is then made to *Doe* v. *Knight*, and a number of other authorities. And again the court says: "The general principle of law is that the formal act of signing, sealing, and delivery is the perfection and consummation of the deed; and it lies with the grantor to prove clearly that the appearances were not consistent with the truth. The presumption is against him, and the task is on him to destroy that presumption by clear and positive proof that there was no delivery, and that it was so understood at that time."

The case of *Blight* v. *Schenck* was cited and relied on in the subsequent case of *Diehl* v. *Emig*, 15 P. F. Smith, 320, where the alleged deed was from a father to his daughter, and was retained in the grantor's possession, and it was objected that there was no proof of delivery; but the court said " 'signed, sealed, and delivered' was the solemn statement of the grantor, formally acknowledged before a magistrate, and admitted to the witnesses;" and that, on the princi-

ple laid down in *Blight* v. *Schenck,* such circumstances, unaccompanied by any fact which would countervail their effect, would establish a *prima facie* case of due execution, including delivery, and call upon the other side to rebut their effect by proof of non-delivery.

In *Hope* v. *Harman,* 11 Jur. 1097, Mr. Hope executed a deed to his nephew for a box of jewels, in the presence of a witness, who signed the attesting clause, "signed, sealed, and delivered." The deed never went out of the possession of the grantor, and Lord DENMAN left it to the jury to say whether it had been duly executed and delivered with intent to operate immediately, and the jury found that it had been. The instruction was held by the court in bank to have been correct.

But declarations of trust are often sustained by much less regard to evidence of delivery than is required for establishing deeds of conveyance. Thus, in *Fletcher* v. *Fletcher,* 4 Hare, 67, the testator, by a voluntary deed, covenanted with trustees that in case A. and B., his two natural sons, should survive him, his executors and administrators should pay to trustees named £60,000 upon trust for them, to be paid at 21 years of age. He retained the deed in his possession and told no one of it. By his will he bequeathed all his property in trust for his widow and other persons. The deed was found among his papers. It was held by Vice-Chancellor WIGRAM that it created a trust for A., (who survived the grantor,) though the trustee refused to sue at law; and that the retention of the deed in the grantor's custody, and not communicating its existence to the trustee or *cestui que trust,* did not affect its validity. On the last point the vice-chancellor referred to *Dillon* v. *Coppin,* 4 Mylne & C. 660, and to *Doe* v. *Knight,* 5 Barn. & C. 671.

This subject is discussed in *Adams* v. *Adams,* 21 Wall. 185; in *Bunn* v. *Winthrop,* 1 Johns. Ch. 329; *Souverbye* v. *Arden,* Id. 255; and in Lewin, Trusts, 152.

Mr. Lewin, as quoted in *Adams* v. *Adams,* gives the following rules on this subject:

"On a careful examination the rule appears to be that, whether there was transmutation of possession or not, the trust will be supported, provided it was, in the first instance, perfectly created. * * * It is evident that a trust is not perfectly created where there is a mere intention or voluntary agreement to establish a trust, the settlor himself contemplating some further act for the purpose of giving it completion. * * * If the settlor propose to convert himself into a trustee, then the trust is perfectly created, and will be enforced as soon as the settlor has executed an express declaration of trust intended to be final and binding upon him, and in this case it is immaterial whether the nature of the property be legal or equitable. * * * Where the settlor proposes to make a stranger the trustee, then, to ascertain whether a valid trust has been created or not, we must take the following distinctions: If the subject of the trust be a legal interest, and one capable of legal transmutation, as land, or chattels, etc., the trust is not perfectly created unless the legal interest be actually vested in the trustee."

It seems to us that the deed in question, regarded merely as a declaration of trust, was clearly executed in a manner to fulfill all the

requirements of such an instrument; though we are further of opinion that it was well and sufficiently executed and delivered as a deed of conveyance to transfer the legal title.

Our conclusion is that the complainants are entitled to a decree declaring that the deed of July 23, 1867, was duly executed and delivered, and became valid and effectual for all the purposes therein expressed at and from the day of its date; and that all the trusts declared in the several instruments described in the bill of complaint, and annexed thereto as Exhibits A, C, and D, should be established, carried out, and enforced, and that an account should be required as prayed for in the bill.

Upon an examination of the master's report we are entirely satisfied with its correctness, and if it were a regular practice to refer the principal controversy in an equity suit to a master, we should be content to accept and confirm the report, without a particular and detailed examination of the evidence. But as this practice is not strictly regular, and as it is the duty of the court itself to pass upon the merits of the case, we have felt it our duty to do so. We have examined the form of decree which the master has proposed and annexed to his report, and are satisfied with it as the proper decree to be entered.

It may be proper to observe, before concluding this opinion, that as the deed of February 2, 1867, from James E. Brown and wife to Mrs. Jane B. Finlay, for the tract of 319 acres of land in Kittanning township, Armstrong county, was executed before the deed of July 23, 1867, and contained identically (or nearly so) the same trusts which are declared in the latter deed, it is paramount thereto, and the complainants will be at liberty, if they see fit, to amend their bill of complaint by setting forth the said deed of February 2, 1867, and praying for the establishment and execution of the trusts therein contained. It was not exhibited in evidence until the present hearing, and had probably been overlooked in the preparation of the bill of complaint.

See *Ireland* v. *Geraghty*, 15 FED. REP. 35, and note 45.—[ED.